UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AQIL AL-SHIMARY,<br><br>                    Plaintiff(s)<br><br>                    v.<br><br>STATE UNIVERSITY OF NEW YORK AT BINGHAMTON (aka BINGHAMTON UNIVERSITY) SARA DECLEMENTE-HAMMOUD, ANDREW BAKER,<br><br>                    Defendant(s). | **JURY TRIAL DEMANDED**<br><br><br><br>**COMPLAINT**<br>Civ. Act. No.: 3:22-cv-01282 (TJM/ML) |

Plaintiff AQIL AL-SHIMARY, by and through his attorneys, HINMAN, HOWARD & KATTELL, LLP, as and for his Complaint against Defendants STATE UNIVERSITY OF NEW YORK AT BINGHAMTON (AKA Binghamton University), SARA DECLEMENTE-HAMMOUD, and ANDREW BAKER alleges the following:

## NATURE OF CLAIM

1.      This is a civil action for discrimination, harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., and the New York Human Rights Law.  The relief sought is monetary/injunctive.

## PARTIES

2.      Plaintiff is an individual with a principle place of residence Broome County, New York.

3.      Upon information and belief, Defendant State University of New York at Binghamton ("Binghamton University") is an educational institution and part of the State University of New York system located in Broome County, New York.

## JURISDICTION

4.      Subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1331 as this complaint raises questions of federal law.

5. Supplemental jurisdiction over the state law claims is proper under 28 U.S.C. § 1367 as the state law claims are closely related in nature and part of the same controversy.

6. Personal jurisdiction is proper in this Court as Defendant is a resident of the District and has a place for operation of business within the District.

7. Plaintiff filed an administrative complaint with the New York State Division of Human Rights which dually filed the complaint with the Equal Employment Opportunity Commission on or about December 9, 2021.

8. On or about July 8, 2022, the Division of Human Rights dismissed the matter for administrative convenience.  A copy of this letter is attached hereto as Exhibit "A".

9. On or about October 25, 2022, the Equal Employment Opportunity Commission issued a Notice of Rights letter to Plaintiff.  A copy of this letter is attached hereto as Exhibit "B".

## VENUE

10.      Venue is proper in this Court by virtue of 28 U.S.C. § 1391(a) as Defendant is a resident of the State and resides in the Distrct.

11.     Further, venue is proper in this Court as the events giving rise to this complaint occurred within the District.

## FACTS COMMON TO ALL CLAIMS

12.     Plaintiff repeats and realleges paragraphs 1-11 as if fully set forth here.

13. Al-Shimary is a naturalized citizen of the United States of Iraqi descent.

14. Al-Shimary identifies as Arabic.

15. Al-Shimary is not white.

16. Al-Shirmary is Muslim.

17. Al-Shimary was hired by Defendant on July 24, 2012, for the position of Cleaner.

18. Al-Shimary was promoted to the title of Plant Utilities Helper, SG-6 in or about June 30, 2016.

19. Al-Shirmary was promoted to the position of Maintenance Assistant, SG-9 in or about February 9, 2017.

20. Al-Shimary has held the position of Maintenance Assistant, SG-9 continuously from February 9, 2017 to present.

21. In his role of SG-9, Plaintiff was assigned to the Fire Alarm Shop.

22. Plaintiff performed all of his duties in a reasonable manner.

23. Since being assigned to the Fire Alarm Shop, Plaintiff has regularly been subjected to discriminatory comments about his ethnicity, color, national origin and religion made by coworkers and his supervisor.

24. Plaintiff received near daily derogatory comments regarding his ethnicity, national origin or religion.

25. Plaintiff was also subjected to negative comments about other Muslims and other people of Arabic descent.

26. Comments made to Plaintiff include, but are not limited to, the following:

a. In or about April 2018, there was a discussion in the Fire Alarm Shop regarding the U.S.-Syrian conflict and specifically that the U.S. had bombed Syria. Plaintiff's supervisor Raymond Hallett commented in front of Plaintiff and coworkers Ted Szlega, David Fontana, Tim Cavanaugh and Tom Buccinell that such bombings were "good" and that the U.S. should "bomb the shit out of Arabic people".

b. In or about June 2018, while working in the Fire Alarm Shop, Mr. Hallett and coworker Ted Szega told Al-Shimary that when he was recently absent on a sick day that they did not believe he was actually sick, but rather that he was going to Iraq to do "god knows what".

c. In or about 2018, Mr. Hallett made similar comments on several other occasions after Al-Shimary returned from approved absences from work, saying in sum and substance that he believed Al-Shimary had traveled to Iraq.

d. In or about January/February of 2020, Plaintiff, Mr. Hallett, Ted Szlega and David Fontana went to a building on campus that houses a Muslim prayer room with a sign asking persons to please take your shoes off before entering the room.  Mr. Hallett said, "I'm not going to take my shoes off. Only at BU do they do this shit and accommodate these people".

e. A woman whose office is located across the hall from the prayer room then came out of her office across from the prayer room and asked Hallett, Szlega, Fontana and Plaintiff to please take our shoes off before entering. Mr. Hallett turned to Plaintiff and said "what is this shit with Muslim people?"

f. When Plaintiff explained to Mr. Hallett why Muslims take their shoes off, Mr. Hallett said "fuck that" and walked into the room with his shoes on causing Plaintiff great distress.

g. In February of 2020, while Plaintiff was working in the Fire Alarm Shop and writing down a phone number, Hallett approached Plaintiff, and in the presence of coworkers David Fontana and Tim Cavanaugh, asked Plaintiff "What is this? Are you writing down a bomb recipe?" and laughed.

h. In February 2020, while working in the Fire Alarm Shop, Mr. Hallett approached Plaintiff and said "Dude, you look like Bin Laden".

i. In February of 2020, Hallett asked Plaintiff, in the presence of coworkers, whether Plaintiff had "drugs or a bomb" in a bag Plaintiff was carrying.

j. In or about January 14, 2021, Plaintiff was working with Tom Bucinell and Rich Blakeslee at the ITC Complex. The office of Mohammad Khasawneh, the Chair of the Systems Science and Industrial Engineering Department had a sign stating "Do Not Enter."

k. Dr. Khasawneh is openly Muslim and is Arabic like Plaintiff.

l. It was the practice of the maintenance department not to enter rooms with such signs without the permission of the occupant.

m. Plaintiff pointed out to Bucinell and Blakeslee that the sign was there and they should not enter.

n. Bucinelle responded that they "did not care, this is America", and he and Blakeslee entered the office despite the sign.  No non-Arabic, non-Muslim employees with signs indicating entry was not permitted had their offices treated the same way.

o. In or about January 21, 2021, Plaintiff was with Tom Bucinell and Ray Hallett in the Fire Alarm Shop. When Biden became President, Tom Bucinell said "great, more immigrants Biden is going to let into this country and take over. Mr. Hallett agreed with him, saying "you're right".  Both glanced at Plaintiff.

p. In or about February 22, 2021, Plaintiff was working with Tom Bucinell and Rich Blakeslee at the ITC Complex. Plaintiff said that is amazing technology that they were studying there. Buccinell said, "yes they're gonna learn all this technology and then use it against us", referring to foreign students who attend the University and to Khasawneh, the Chair of the Department.

q. Following the 2021 election, Plaintiff was subjected to daily comments by Hallett, Bucinell, Blakeslee and Szlega that were derogatory about immigrants.  These included comments such "Sleepy Joe is going to ruin the country; Let's make it easy for the foreigners to come here"; "The foreigners are going to take over our jobs"; "They are going to have more rights than we do"; "Between the foreigners and blacks now, the Democrats are going to get all the votes and we are never going to get the House and Senate back".

27. In or about March 20, 2020, Plaintiff advised Mr. Hallett via e-mail, phone conversation and in person, that Plaintiff had a life-threatening medical condition that

made him particularly susceptible to COVID-19.  Plaintiff requested the accommodation of working in the shop to limit his exposure to others on campus who might carry the virus.

28. Instead of working with Plaintiff to accommodate him, Hallett directed Al-Shimary and Szlega to go in the field with HVAC staff to carry hoses.

29. Plaintiff reminded Hallett that he had requested the accommodation of limiting his exposure to other people to which Hallett replied "nothing is going to happen to you, you're not gonna die."

30. Plaintiff ended up using leave for the day to avoid unnecessary exposure.

31. Upon information and belief, Hallett did not ignore non-Muslim, non-Arabic employee's requests for accommodation.

32. Plaintiff provided a medical release dated March 26, 2020 from his nephrologist, Dr. Sally Lee, MD, to support his absence.

33. Despite his medical release, in or about August of 2020, Mr. Hallett again required Plaintiff to work in the field.

34. When Plaintiff complained to Mr. Hallett, Mr. Hallett indicated that "human resources" said he (Mr. Hallett) could make Plaintiff work in the field.

35. In or about 2020, in an effort to get rid of Plaintiff, Hallett manufactured charges against him under the University Work Place Violence Policy.

36. On September 2, 2020, Plaintiff and his representative met with Sara DeClemente-Hammoud, of Human Resources, for a disciplinary interrogation.

37. During the meeting, Plaintiff relayed to Declemente-Hammoud that Hallett had ignored his requests for accommodation of his serious medical condition.

38. During the meeting, Plaintiff relayed to Declemente-Hammoud the persistent discrimination he was experiencing in the Fire Alarm Shop.

39. Plaintiff documented the issues he was experiencing and provided it to Ms. Declemente-Hammoud.

40. Upon information and belief, nothing was done as a result of Plaintiff's complaints.

41. Instead, on September 9, 2020, Hallett met with each of the other members of the Fire Alarm shop and told them that Plaintiff was "playing the foreigner and race card."

42. Following Hallett's meetings on September 9, 2020, coworkers would not speak to Plaintiff, which caused undue stress, continued harassment and a hostile work environment for Plaintiff.

43. On March 10, 2021, Plaintiff met with Hallett to discuss the work environment in the Fire Alarm Shop.

44. Plaintiff told Hallett that since his September 2020 conversations with the coworkers, many coworkers were treating him even worse than before.

45. Plaintiff told Hallett that the situation had become so upsetting that he sought treatment by his family physician.

46. Hallett told Plaintiff he would call in each person individually and ask them to stop.

47. On March 25, 2021, when Plaintiff arrived to work in the Fire Alarm Shop he was confronted by coworker Mark Devine.

48. Devine was eventually joined by coworker Tom Buccinell in verbally attacking him.

49. Devine and Buccinell and others surrounded Plaintiff and taunted him while videotaping him.

50. The confrontation ended with Plaintiff being so fearful that he raised his voice in response.

51. The situation caused so much stress for Plaintiff that he was forced to take the afternoon off to not have to be subjected to these coworkers.

52. The following afternoon, DeClemente-Hammoud directed Plaintiff to go to Human Resources, where she had him removed from campus by the University Police Department for alleged violence.

53. Devine and Buccinell taunted, threatened and provoked Plaintiff because of their dislike of his national origin and religion and in retaliation for the complaints he had made about them.

54. On April 6, 2021, Plaintiff was required to submit to a disciplinary interrogation before Declemente-Hammoud regarding the March 25 incident.

55. On April 6, 2021, Plaintiff again raised with DeClemente-Hammoud the continued harassment he was receiving and advised regarding the September 9 conversation Hallett had with employees that had led to more harassment and retaliation.

56. Upon information and belief, nothing was done as a result of Plaintiff's complaints.

57. Declemente-Hammoud advised that Plaintiff would be subjected to employment discipline for the March 25 events and that if he wanted to file a discrimination complaint he would have to do so through the University's Office of Diversity, Equity and Inclusion, which was a complaint procedure she had not advised about during the September 2020 meeting with her.

58. Plaintiff was suspended without pay from his position as a Maintenance Assistant on or about April 20, 2021.

59. Plaintiff filed a complaint of discrimination and retaliation with Andrew R. Baker, the University's Senior Compliance Officer and Title IX Coordinator, on April 20, 2021.

60. Mr. Baker responded to Plaintiff's complaint by e-mail dated April 21, 2021, stating that the complaint lacked enough specificity for him to investigate and requested that Plaintiff provide additional, unspecified information.

61. Once again, the University did nothing to protect Plaintiff.

62. On or about May 6, 2021, Plaintiff was served with a notice of employment discipline advising that the University was seeking to terminate his employment because of alleged violations of the University's Workplace Violence Policy on March 25, 2021.

63. Ultimately, those charges were resolved between the University and the Union so that Plaintiff could return to work with back pay except for a one-week period of time.

64. Al-Shimary lost pay and benefits as no back pay has been awarded to him and no benefits were available to him from March 26, 2021 through October 13, 2022 .

65. Upon information and belief, neither Mr. Devine nor Mr. Buccinell were pursued for discipline for their role in the March 25, 2021, confrontation.

66. On or about June 21, 2021, Mr. Baker e-mailed Plaintiff to say that the University "is not currently taking action based on the information you submitted on April 20, 2021, because it lacks enough specificity to proceed".

67. Baker never met with Plaintiff, never interviewed Plaintiff, and never interviewed any of the witnesses identified in Plaintiff's complaint.

### FIRST CAUSE OF ACTION-TITLE VII HARASSMENT

68. Plaintiff repeats and realleges paragraphs 1-67 as if fully set forth here.

69. Plaintiff is a member of a protected class as he is Arabic, Iraqi nationality, and Muslim.

70. Plaintiff was qualified for his job and his job performance was at least satisfactory.

71. Plaintiff was subjected to a hostile work environment by his co-workers and supervisors as set out above.

72. This hostile work environment included near daily comments about Plaintiff's ethnicity, nationality or religion.

73. This hostile work environment included regular threats toward Plaintiff and others of Plaintiff's ethnicity, nationality and religion.

74. Plaintiff raised complaints about his treatment on a regular basis.

75. Nothing was done to either investigate Plaintiff's complaints or protect Plaintiff.

76. As a result, Plaintiff suffered severe emotional distress including sleeplessness, headaches, stomachaches.

77. As a result of the behavior directed at Plaintiff, Plaintiff was forced to be in a hyper alert state at all times around his coworkers, could not trust his coworkers, and feared for his safety.

78. As a result of the behavior directed at Plaintiff, Plaintiff was forced to take time off from work lessening his available paid time off.

79. As a result of the behavior directed at Plaintiff, Plaintiff lost wages and benefits.

**SECOND CAUSE OF ACTION-NEW YORK HUMAN RIGHTS LAW HARASSMENT**

80. Plaintiff repeats and realleges paragraphs 1-79 as if fully set forth here.

81. Plaintiff is a member of a protected class as he is Arabic, Iraqi nationality, and Muslim.

82. Plaintiff was qualified for his job and his job performance was at least satisfactory.

83. Plaintiff was subjected to a hostile work environment by his co-workers and supervisors as set out above.

84. This hostile work environment included near daily comments about Plaintiff's ethnicity, nationality or religion.

85. This hostile work environment included regular threats toward Plaintiff and others of Plaintiff's ethnicity, nationality and religion.

86. Plaintiff raised complaints about his treatment on a regular basis.

87. Nothing was done to either investigate Plaintiff's complaints or protect Plaintiff.

88. As a result, Plaintiff suffered severe emotional distress including sleeplessness, headaches, stomachaches.

89. As a result of the behavior directed at Plaintiff, Plaintiff was forced to be in a hyper alert state at all times around his coworkers, could not trust his coworkers, and feared for his safety.

90. As a result of the behavior directed at Plaintiff, Plaintiff was forced to take time off from work lessening his available paid time off.

91. As a result of the behavior directed at Plaintiff, Plaintiff lost wages and benefits.

**THIRD CAUSE OF ACTION—DISCRIMINATION TITLE VII**

92. Plaintiff repeats and realleges paragraphs 1-91 as if fully set forth herein.

93. Plaintiff is a member of a protected class as he is Arabic, Iraqi nationality, and Muslim.

94. Plaintiff was qualified for his job and his job performance was at least satisfactory.

95. Plaintiff was treated less favorably than others who were not in the protected classes as set out above.

96. In addition, Plaintiff was treated less favorably than others who were not in the protected classes in the following ways:

a. His need for accommodation for his serious medical accommodation was ignored by his supervisors who required him to expose himself to serious illness and death;

b. His complaints of discrimination were ignored and not investigated by the University.

c. His supervisor and co-workers were allowed to repeatedly bring false disciplinary charges against him, but were never disciplined for their behavior toward him.

97. As a result, Plaintiff suffered severe emotional distress including sleeplessness, headaches, stomachaches.

98. As a result of the behavior directed at Plaintiff, Plaintiff was forced to be in a hyper alert state at all times around his coworkers, could not trust his coworkers, and feared for his safety.

99. As a result of the behavior directed at Plaintiff, Plaintiff was forced to take time off from work lessening his available paid time off.

100. As a result of the behavior directed at Plaintiff, Plaintiff lost wages and benefits.

**FOURTH CAUSE OF ACTION—DISCRIMINATION HUMAN RIGHTS LAW**

101. Plaintiff repeats and realleges paragraphs 1-100 as if fully set forth herein.

102. Plaintiff is a member of a protected class as he is Arabic, Iraqi nationality, and Muslim.

103. Plaintiff was qualified for his job and his job performance was at least satisfactory.

104. Plaintiff was treated less favorably than others who were not in the protected classes as set out above.

105. In addition, Plaintiff was treated less favorably than others who were not in the protected classes in the following ways:

a. His need for accommodation for his serious medical accommodation was ignored by his supervisors who required him to expose himself to serious illness and death;

b. His complaints of discrimination were ignored and not investigated by the University.

c. His supervisor and co-workers were allowed to repeatedly bring false disciplinary charges against him, but were never disciplined for their behavior toward him.

106. As a result, Plaintiff suffered severe emotional distress including sleeplessness, headaches, stomachaches.

107. As a result of the behavior directed at Plaintiff, Plaintiff was forced to be in a hyper alert state at all times around his coworkers, could not trust his coworkers, and feared for his safety.

108. As a result of the behavior directed at Plaintiff, Plaintiff was forced to take time off from work lessening his available paid time off.

109. As a result of the behavior directed at Plaintiff, Plaintiff lost wages and benefits.

### FIFTH CAUSE OF ACTION—RETALIATION TITLE VII

110. Plaintiff repeats and realleges paragraphs 1-109 as if fully set forth herein.

111. Plaintiff engaged in protected activity when he complained to DeClemente-Hammoud, Hallett and Baker about the way he was treated.

112. His complaints to DeClemente-Hammoud resulted in retaliation against him including but not limited to:

a.  increased insults,

b. freezing out by his co-workers,

c. his supervisor telling his co-workers not to talk to him, and

d. his co-workers and supervisors complaining about him to others in other departments, making it harder for Plaintiff to perform his work.

113. His complaints to DeCelemente-Hammound and Hallett resulted in additional retaliation including, but not limited to:

a.  his co-workers surrounding him while videotaping him and insulting him leaving him fearing for his life,

b. Co-workers filing false disciplinary charges against him,

c. having to defend disciplinary charges brought by the university that included seeking his termination because of his self-defense,

d. Being given a disciplinary suspension for the actions he had to take to defend himself, and

e. no consequences for his co-workers or supervisors for their behavior toward Plaintiff.

114. His complaints to Baker resulted in additional retaliation including but not limited to:

a. Having his claim ignored and not investigated

b. No consequences for his co-workers or supervisors

116. As a result of the retaliation Plaintiff suffered, he lost wages.

117. As a result of the retaliation Plaintiff suffered, he suffered extreme emotional distress including sleeplessness, hyper alertness, anxiety, depression, stomach aches, headaches, irritability, and problems with his relationships.

### SIXTH CAUSE OF ACTION—RETALIATION HUMAN RIGHTS LAW

118. Plaintiff repeats and realleges paragraphs 1-117 as if fully set forth herein.

119. Plaintiff engaged in protected activity when he complained to DeClemente-Hammoud, Hallett and Baker about the way he was treated.

120. His complaints to DeClemente-Hammoud resulted in retaliation against him including, but not limited to:

a.  increased insults,

b. freezing out by his co-workers,

c. his supervisor telling his co-workers not to talk to him, and

d. his co-workers and supervisors complaining about him to others in other departments, making it harder for Plaintiff to perform his work.

121. His complaints to DeCelemente-Hammound and Hallett resulted in additional retaliation including but not limited to:

a.  his co-workers surrounding him while videotaping him and insulting him leaving him fearing for his life,

b. Co-workers filing false disciplinary charges against him,

c. having to defend disciplinary charges brought by the university that included seeking his termination because of his self-defense,

d. Being given a disciplinary suspension for the actions he had to take to defend himself, and

e. no consequences for his co-workers or supervisors for their behavior toward Plaintiff.

122. A His complaints to Baker resulted in additional retaliation including but not limited to:

a. Having his claim ignored and not investigated

b. No consequences for his co-workers or supervisors.

123. As a result of the retaliation Plaintiff suffered, he lost wages.

124. As a result of the retaliation Plaintiff suffered, he suffered extreme emotional distress including sleeplessness, hyper alertness, anxiety, depression, stomach aches, headaches, irritability, and problems with his relationships.

## SEVENTH CAUSE OF ACTION AIDER AND ABETTOR UNDER THE HUMAN RIGHTS LAW DECLEMENTE-HAMMOUD

125. Plaintiff repeats and realleges paragraphs 1-124 as if fully set forth herein.

126. Sara Declemente-Hammoud is currently the Director of Human Resources at Defendant State University of New York at Binghamton (aka Binghamton University) and was a Senior Associate Director of Human Resources and Labor Relations.

127. Plaintiff repeatedly complained to Sara DeClemente-Hammoud about the harassment and retaliation he was experiencing at work.

128. DeClemente-Hammoud was aware of the harassment and retaliation being experienced by Plaintiff.

129. DeClemente-Hammoud was in a position of authority to have investigated Plaintiff's claims and/or requested investigation of such claims and to suggest or impose discipline.

130. DeClemente-Hammoud did nothing to protect Plaintiff.

131. As such, DeClemente-Hammoud aided and abetted the harassment of Plaintiff by his co-workers and supervisor.

132. As a result of the conduct of DeClemente-Hammoud, Plaintiff suffered mental and emotional distress, and became physically ill at times.

133. As a result of the conduct of DeClemente-Hammoud, Plaintiff lost wages and benefits.

## EIGHTH CAUSE OF ACTION AIDER AND ABETTOR UNDER THE HUMAN RIGHTS LAW-BAKER

134. Plaintiff repeats and realleges paragraphs 1-133 as if fully set forth herein.

135. Andrew Baker was and is a Senior Compliance Officer and Title IX Coordinator at Defendant State University of New York at Binghamton (aka Binghamton University).

136. Plaintiff complained to Baker about the harassment and retaliation he was experiencing at work.

137. Baker was aware of the harassment and retaliation being experienced by Plaintiff.

138. Baker was in a position of authority to have investigated Plaintiff's claims and/or requested investigation of such claims and to suggest or impose discipline.

139. Baker did nothing to protect Plaintiff.

140. As such, Baker aided and abetted the harassment of Plaintiff by his co-workers and supervisor.

141. As a result of the conduct of Baker, Plaintiff suffered mental and emotional distress, and became physically ill at times.

142. As a result of the conduct of DeClemente-Hammoud, Plaintiff lost wages and benefits.

## CONCLUSION

**WHEREFORE**, plaintiff respectfully requests a jury trial on all issues; and hereby demands judgment in an amount to be determined at trial plus interest at the appropriate statutory rate; plus the costs and attorneys' fees incurred in bringing this action; and for any other and further relief this court deems just and proper.

_/s/ Dawn J Lanouette_

Dated: November 30, 2022
  Binghamton, New York

Dawn J. Lanouette, Esq.
Bar Roll No. 302595
HINMAN, HOWARD & KATTELL, LLP
Attorneys for the Plaintiff
Office and Post Office Address
80 Exchange Street
P.O. Box 5250
Binghamton NY  13902-5250
[Telephone: (607) 723-5341
dlanouette@hhk.com