**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**AQIL AL-SHIMARY,**

                **Plaintiff,**

    **v.**                                       **No. 3:22-cv-1282**
                                                **(TJM/ML)**

**STATE UNIVERSITY OF NEW YORK AT**
**BINGHAMTON, a/k/a Binghamton University,**
**SARA DECLEMENTE-HAMMOUD, and**
**ANDREW BAKER,**

                **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


### DECISION & ORDER

    Before the Court is Defendants' partial motion to dismiss the Complaint.  <u>See</u> dkt. #

10.  The parties have briefed the issues, and the Court will decide the matter without oral

argument.

**I.**    **Background**

    This case concerns Plaintiff Aqil Al-Shimary's claims that Defendants, the State

University of New York at Binghamton ("Binghamton"), Sara DeClemente-Hammoud, and

Andrew Baker, discriminated against him because of his race and religion during his

employment at Binghamton and retaliated against him for complaining about that

discrimination in violation of federal and New York law.

Plaintiff starting working as a Cleaner for Binghamton on July 24, 2012.  Complaint ("Complt."), dkt. # 1, at ¶ 17.  Plaintiff is a naturalized citizen of the United States of Iraqi descent.  Id. at ¶ 13.  He "is not white," "identifies as Arabic," and "is Muslim."  Id. at ¶¶ 14-16. Binghamton promoted Plaintiff to the position of Plant Utilities Helper on June 30, 2016, and then to the position of Maintenance Assistant on February 9, 2017.  Id. at ¶¶ 18-19.  Since February 9, 2017, Plaintiff continues to hold the Maintenance Assistant position.  Id. at ¶ 20.   As a Maintenance Assistant, Plaintiff was assigned to the Fire Alarm Shop.  Id.  at ¶ 21.

Plaintiff alleges that he "has regularly been subjected to discriminatory comments about his ethnicity, color, national origin and religion made by his coworkers and his supervisor" since he started working in the Fire Alarm Shop.  Id. at ¶ 23.   Such comments about his religion, ethnicity, and national origin occurred "nearly daily[.]" Id. at ¶ 24.  Those comments included "negative" statements "about other Muslims and other people of Arabic descent."  Id. at ¶ 25.  Plaintiff cites to several such statements, noting that the derogatory statements were "not limited" to those he lists.  Id. at ¶ 26.  He points to statements such as: comments from Plaintiff's supervisor Raymond Hallett in April 2018 in the presence of Plaintiff and several coworkers that expressed approval of United States bombings in Syria where Hallett called "such bombings . . . 'good'" and claimed "that the U.S. should 'bomb the shit out of Arabic people'"; in June 2018, Hallett and a coworker told Plaintiff that Plaintiff's absence on a sick day was not due to illness, but because Plaintiff "was going to Iraq to do 'god knows what'"; comments from Hallett in 2018 "on several occasions" that Hallett believed Plaintiff had traveled to Iraq when he was absent from work; complaints from Hallett in January or February 2020 when Hallett, Plaintiff and another coworker

2

entered a building on the Binghamton campus that housed a Muslim prayer room about a sign requesting that people take off their shoes before entering the room, where Hallett declared "'I'm not going to take my shoes off.  Only at BU do they do this shit and accommodate these people'"; when a woman asked the men to take off their shoes before entering, "Hallet turned to Plaintiff and said 'what is this shit with Muslim people?'"; Plaintiff explained the religious rules regarding shoes, but "Hallett said 'fuck that' and walked into the room with his shoes on causing Plaintiff great distress'"; in February 2020, Hallett approached Plaintiff in the workplace in the presence of two coworkers, noticed Plaintiff writing down a phone number, and stated "'What is this?  Are you writing down a bomb recipe?' and laughed"; that same month, Hallett walked up to Plaintiff in the workplace and told Plaintiff "'Dude, you look like Bin Laden'"; on January 14, 2021, Plaintiff and two coworkers approached the office of the Chair of the Systems Science and Industrial Engineering Department, who was "openly Muslim and . . . Arabic like Plaintiff"; the professor had a sign on his door that stated "'Do Not Enter'"; the maintenance department had a practice of not entering offices posted with that message without obtaining permission from the occupant; Plaintiff pointed out the sign to his coworkers, and one responded that "they 'did not care, this is America,'" and the two coworkers entered the office; Plaintiff alleges that his coworkers respected the wishes of office occupants who were not Muslim or Arabic; when Joe Biden became president on January 21, 2021, a coworker who was with Hallett and Plaintiff remarked "'great, more immigrants Biden is going to let into this country and take over"; Hallett agreed, stating "'you're right,'" and both men "glanced at Plaintiff"; on February 22, 2021, while working with two other employees in Binghamton's technology center, Plaintiff remarked on the "amazing technology they were studying there," and one of

his coworkers. referring to Plaintiff and the Muslim and Arabic chair of the department,
stated "yes, they're gonna learn all this technology and then use it against us'"; and after the
2021, election, "Plaintiff was subjected to daily comments by Halwell" and his coworkers
that degraded immigrants, such as "Sleepy Joe is going to ruin this country; Let's make it
easy for the foreigners to come here'; 'The foreigners are going to take over our jobs'; 'They
are going to have more rights than we do'; 'Between the foreigners and blacks now, the
Democrats are going to get all the votes and we are never going to get the House and
Senate back.'" Id. at ¶¶ 26(a)-(q).

On March 20, 2020, Plaintiff informed Hallett by phone, email, and in-person that he
"had a life-threatening medical condition" that left "him particularly susceptible to COVID-
19." Id. at ¶ 27.  Plaintiff requested an accommodation: "working in the shop to limit his
exposure to others on campus who might carry the virus."  Id. Hallett instead instructed
Plaintiff to join Szelga "to go in the field with HVAC staff to carry hoses."  Id.  When Plaintiff
reminded Hallett of his requested accommodation, Hallett responded that "'nothing is going
to happen to you, you're not gonna die.'" Id. at ¶ 29.  Plaintiff used leave for that day to
avoid exposure.  Id. at ¶ 30.  Plaintiff alleges that Hallett did not ignore requests for such
accommodations from employees who were not Muslim or Arabic.   Id. at ¶ 31.

Plaintiff supplied a medical release dated March 26, 2020 from his nephrologist, Dr.
Sally Lee.  Id. at ¶ 32.  The release "support[ed] his absence."  Id.  Despite this release,
Hallett again assigned Plaintiff to work in the field in August 2020.  Id. at ¶ 33.  When
Plaintiff complained, Hallett told Plaintiff that "human resources" told Hallett that he could
make Plaintiff work in the field.  Id. at ¶ 34.

Plaintiff alleges that "[i]n or about 2020, in an effort to get rid of Plaintiff, Hallett

4

manufactured charges against him under the University Work Place Violence Policy." Id. at ¶ 35. Plaintiff, along with his representative, met with Sara DeClemente-Hammoud on September 2, 2020 for a disciplinary interrogation. Id. at ¶ 36. At that meeting, Plaintiff informed DeClemente-Hammount that Hallett had disregarded his requests to accommodate his medical condition and the "persistent discrimination he was experiencing in the Fire Alarm Shop." Id. at ¶¶ 37-38. Plaintiff provided DeClemente-Hammoud with documentation of these problems. Id. at ¶ 39.

Plaintiff alleges that "nothing was done" in response to these complaints. Id. at ¶ 40. Instead, he contends, Hallett met with the other employees in the Fire Alarm shop on September 9, 2020 "and told them that Plaintiff was 'playing the foreigner and race card.'" Id. at ¶ 41. After this meeting, Plaintiff's coworkers stopped speaking him "which caused undue stress, continued harassment and a hostile work environment" for him. Id. at ¶ 42.

Plaintiff met with Hallett on March 10, 2021. Id. at ¶ 43. Plaintiff and Hallett "discuss[ed] the work environment in the Fire Alarm Shop." Id. Plaintiff informed Hallett that his coworkers had been treating him worse than before the September 2020 conversations. Id. at ¶ 44. The situation had become so difficult, Plaintiff told Hallett, that he had sought treatment from his family physician. Id. at ¶ 45. Hallett told Plaintiff he would speak to each of Plaintiff's coworkers individually and instruct them to stop harassing Plaintiff. Id. at ¶ 46.

Plaintiff's coworker Mark Devine confronted Plaintiff when he arrived for work at the Fire Alarm Shop on March 25, 2021. Id. at ¶ 47. Tom Buccinell eventually joined in Devine's "verbal attacking" of the Plaintiff. Id. at ¶ 48. Devine, Buccinell, joined by "others," "surrounded Plaintiff and taunted him while videotaping him." Id. at ¶ 49. Plaintiff became

so afraid in response to this conduct that "he raised his voice in response." Id. at ¶ 50.

Plaintiff experienced so much stress from this situation that he had to take the afternoon off.

Id. at ¶ 51.  The next day, DeClemente-Howard instructed Plaintiff to go to Human

Resources.  Id. at ¶ 52.  There, DeClemente-Howard had Plaintiff removed from campus by

the University Police.  Id.   Plaintiff had allegedly been involved in "violence."  Id.

Plaintiff alleges that "Devine and Buccinell taunted, threatened and provoked Plaintiff

because of their dislike of his national origin and religion and in retaliation for the complaints

he had made about them."  Id. at ¶ 53.

Plaintiff had "to submit to a disciplinary interrogation" from DeClemente-Hammoud

about the March 25, 2021 incident on April 6, 2021.  Id. at ¶ 54.  At that "interrogation,"

Plaintiff raised the harassment he continued to receive and informed DeClemente-

Hammoud that his September 9, 2020 conversation with Hallett had only "led to more

harassment and retaliation."  Id. at ¶ 55.  Plaintiff alleges that "nothing" occurred to address

these issues.  Id. at ¶ 56.  DeClemente-Hammoud told Plaintiff he would receive

employment discipline for the March 25, 2021 incident.  Id. at ¶ 56.  She also told Plaintiff

that if he wanted to file a discrimination complaint he would need to go through the

University's Office of Diversity, Equity and Inclusion.  Id. at ¶ 57.  DeClemente-Hammoud

did not inform Plaintiff that he needed to use that procedure to file a complaint during the

September 2020 meeting that the two had.  Id.

On April 20, 2021, Plaintiff was suspended without pay from his Maintenance

Assistant position. Id. at ¶ 58.  Plaintiff filed a discrimination and retaliation complaint that

same day with Andrew R. Baker, Senior Compliance Officer and Title IX Coordinator.  Id. at

¶ 59.  Baker responded on April 21, 2021, stating that Plaintiff's complaint was not specific

enough for him to investigate.  Id. at ¶ 60.  Baker requested additional information, but did not explain what he needed.  Id.  Plaintiff alleges that "the University did nothing to protect" him.  Id. at ¶ 61.

Plaintiff received notice of employment discipline on May 6, 2021.  Id. at ¶ 62.  The notice advised Plaintiff that the University sought to terminate his employment due to his alleged violations of the University's workplace violence policy on March 21, 2021.  Id.  The University and Plaintiff's union ultimately resolved those charges and Plaintiff returned to work with back pay, except for a one-week period.  Id. at ¶ 63.  Still, Plaintiff lost back pay and benefits; he has not been awarded back pay and no benefits were available to him from March 26, 2021 through October 13, 2022.  Id. at ¶ 64.

Plaintiff alleges that neither Devine nor Buccinell faced discipline for their role in the March 25, 2021 incident.  Id. at ¶ 65.  Baker emailed Plaintiff on June 21, 2021 to inform him that the University would not "tak[e] action based on the information you submitted in April 2021, because it lacks enough specificity to proceed.'"  Id. at ¶ 66.  Baker did not meet with Plaintiff, interview him, or interview any of the witnesses Plaintiff identified in his complaint.  Id. at ¶ 67.

Plaintiff filed a Complaint in this action on November 30, 2022.  The Complaint contains eight causes of action under state and federal law.  Count One alleges harassment on the basis of Plaintiff's religion and ethnicity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq.  Count Two alleges harassment on the same basis in violation of the New York Human Rights Law ("NYHRL").  Count Three alleges discrimination under Title VII.  Count Four alleges discrimination under the NYHRL.  Count Five alleges Title VII retaliation.  Count Six alleges retaliation under the NYHRL.  Count

Seven alleges aider and abettor liability under the NYHRL against DeClemente-Hammoud. Count Eight alleges such liability against Baker.

After Plaintiff served Defendants with the Complaint, Defendants filed the instant motion. The parties have briefed the issues.

## II.   LEGAL STANDARDS

Defendants seek dismissal for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). A defendant moving for dismissal pursuant to Rule 12(b)(6) argues that the plaintiff cannot prevail, even if all factual allegations in the complaint were proved true. In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). This tenet does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

Defendants also seek dismissal for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). "A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it.'" Cortlandt St. Recovery Corp. v. Hellas Telecomms., 790 F.3d 411, 416-17 (2d Cir. 2015) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). A court addressing such a motion "may refer to evidence outside the pleadings," and the plaintiff "has the burden of providing by a preponderance of

the evidence" that subject matter jurisdiction "exists."  <u>Makarova</u>, 201 F.3d at 113.

**III.    Analysis**

Defendants seek dismissal on a number of grounds, which the Court will address in turn.

**A.    Events that Defendants Claim are Time-Barred**

Defendants first argue that the Court should dismiss any Tittle VII claims for conduct that occurred more before February 12, 2021 as barred by the statute of limitations. Plaintiff filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 9, 2021, and any discriminatory action that occurred more than 300 days before that event, Defendants claim, cannot be a basis for recovery. The Complaint, Defendants argue, points to conduct that occurred on various dates before February 12, 2021, and none of that conduct should be considered in this matter.  Plaintiff responds that his complaint alleges a pattern of harassment and discriminatory conduct that occurred over a period of time and which culminated in an adverse employment action–bringing Plaintiff up on false charges–that occurred within the relevant time period. He contends, therefore, that he has alleged a continuing violation whether considered under a claim for discrimination or a hostile environment.  Defendants respond that Plaintiff has pointed only to a series of discrete acts, which does not constitute the sort of continuing violation which would permit consideration of that conduct in evaluating Plaintiff's discrimination claims.

In federal employment discrimination actions, "generally if the plaintiff has initially filed an administrative claim in a state whose laws prohibit such discrimination, the

9

limitations period for filing an action is 300 days after the alleged unlawful practice." <u>Davis-Garett v. Urban Outfitters, Inc.</u>, 921 F.3d 30, 42 (2d Cir. 2019). "This statutory requirement 'operates as a statute of limitations.'" <u>Banks v. GM, LLC</u>, 81 F.4th 242, 2023 U.S. App. LEXIS 23757, at *21 (2d Cir. Sept. 7, 2023) (quoting <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 394 (1982)). When a plaintiff alleges "unlawful discrimination or retaliation, discrete actions such as 'termination, failure to promote, denial of transfer, or refusal to hire are easy to identify' and are 'not actionable if time barred, even when they are related to facts alleged in timely filed charges.'" <u>Id.</u> at *21-22 (quoting <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114-15 (2002)). An "exception" to this time bar applies, however, "if the discrimination" in question "constitutes a 'continuing violation.'" <u>Id.</u> at *22. "[i]f 'specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice, a continuing violation may be found.'" <u>Id.</u> (quoting <u>Van Zandt v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 713 (2d Cir. 1996)). If a court finds a continuing violation, the "court must then consider 'all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred.'" <u>Id.</u> (quoting <u>Van Zandt</u>, 80 F.3d at 713).

When a plaintiff raises a hostile work environment claim, "a different analysis than discrimination or retaliation claims" occurs. <u>Id.</u> Such claims, courts conclude, by "'[t]heir very nature [involve] repeated conduct.'" <u>Id.</u> (quoting <u>Morgan</u>, 536 U.S. at 115). For hostile environment claims "incidents that give rise to" such claims "'occur[] over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own.'" <u>Id.</u>

(quoting Morgan, 536 U.S. at 115).  Acts giving rise to the hostile environment claims may fall out of the time period in question "[s]o long as 'an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for . . .  determining liability.'" Id. (quoting Morgan, 536 U.S. at 117).

The Court will deny the motion in this respect.  Plaintiff here raises claims both for harassment and discrimination, and the parties agree that some discrete acts occurred within the limitations period.  The question, then, is whether events that occurred outside the limitations period can be used as evidence of either claim.  As related above, Plaintiff alleges that his supervisor and other employees in the Fire Alarm Shop subjected him to a years-long series of hostile and discriminatory statements related to his race and religion which culminated in a discrete act of discrimination.  Plaintiff alleges that the conduct, which included accusing Plaintiff of terrorism and comments denigrating his Islamic faith, persisted for years and that his employer did nothing to address the issue.  Under these circumstances, the Court finds that Plaintiff has alleged facts sufficient to allege "'specific and related instances of discrimination [which were] permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice[.]'" Banks, 2023 U.S. App. LEXIS 23757 at *22.  Such allegations can therefore be used to support a discrimination claim.  Likewise, Plaintiff's allegations of harassment began before the limitations period and continued into that period, and may be considered in evaluating the harassment claim.  The motion will therefore be denied in this respect.

B.    Title VII Claims Against DeClemente-Hammoud and Baker

Defendants next argue that Plaintiff's Title VII claims against DeClemente-Hammound and Baker must be dismissed, since no individual liability exists under that

11

statute.  Plaintiff responds that he did not plead or otherwise claim individual liability under Title VII against these Defendants.

The parties appear to agree that no individual liability exists under Title VII. As such, the Court will grant the motion to the extent that any claim for Title VII liability against either of these two Defendants exists.

### C.    Liability for DeClemente-Hammoud and Baker as Employers

Defendants next argue that DeClemente-Hammound and Baker also cannot be liable as employers under the NYSHRL.  Plaintiff alleges he was employed by the University, not by Baker or DeClemente-Hammoud.  To the extent that Plaintiff seeks to raise aiding and abetting claims against these Defendants under the NYSHRL, Defendants argue, such claims are not viable.  They argue that Plaintiff has failed to plead facts sufficient to support a claim that either Defendant aided and abetted the University's allegedly illegal activity. Plaintiff responds that he has alleged facts sufficient to support an aiding and abetting claim against these Defendants.  Defendant replies that such claims are merely conclusory and are insufficient to make plausible a right to relief.

The NYSHRL "prohibit[s] 'aid[ing], abet[ting], incit[ing], compel[ing] or coerc[ing] the going' of any unlawful acts of discrimination[,] . . . including sexual harassment and retaliation."  McHenry v. Fox News Network, LLC, 510 F.Supp.3d 51, 68 (S.D.N.Y. 2020) (quoting N.Y. Exec. Law § 296(6)).  The aiding and abetting provision "allow[s] a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff."  Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)).  To state a claim, a plaintiff should allege

that the "aider and abettor 'actually participated in the conduct giving rise to the claim of discrimination,' and that the 'aider and abettor share the intent or purpose of the principal actor.'" Griffin v. Sirva Inc., 835 F.3d 283, 293 (2d Cir. 2016) (quoting Idlison v. NYS Dep't of Taxation & Fin., No. 12-CV-1787 MAD/CFH, 2013 U.S. Dist. LEXIS 83131, 2013 WL 2898050, at *4-5 (N.D.N.Y. June 13, 2013)).  A supervisor who "took no action to remedy . . . behavior" that violated the NYSHRL "although they were aware of it" or engaged in adverse employment actions against a plaintiff "on the basis of impermissible factors" can be liable for aiding and abetting as well.  Feingold, 366 F.3d at 158; see also, Parra v. City of White Plains, 48 F.Supp.3d 542, 555 (S.D.N.Y. 2014) ("'[A] supervisor's failure to take adequate remedial measures' in response to a complaint of discrimination has been deemed 'actual participation' under" the aiding and abetting provision.) (quoting Lewis v. Triborough Bridge & Tunnel Auth., 77 F.Supp.2d 376, 379 (S.D.N.Y. 1999)).

The Court will deny the motion on this basis as well.  As related above, Plaintiff alleges that he informed DeClemente-Hammoud on at least two occasions of discrimination, yet she did nothing to address the problem.  Plaintiff also alleges that DeClemente-Hammoud disciplined him for workplace violence under circumstances that raise an inference of discrimination.  Similarly, he alleges that Baker, made aware of the discrimination that Plaintiff alleges he faced in the workplace, did nothing to help Plaintiff in making a complaint about the matter.  Such allegations are sufficient to make plausible that Defendants aided and abetted a violation.

### D.    Eleventh Amendment Immunity

Finally, Defendant seeks dismissal of any claims against the University under the NYSHRL as barred by the doctrine of sovereign immunity.  Plaintiff does not deny that

13

Eleventh Amendment Immunity normally applies to claims brought against the University under the NYSHRL, but argues that the University has waived such immunity.  Plaintiff relates that he first brought claims before the New York Division of Human Rights and then sought dismissal in an effort to bring all his claims together in federal court.  He contends that the Division of Human Rights notified the University and asked for any objections.  He claims the University did not object to claims being brought in federal court, and the Division of Human Rights dismissed the complaint before that body on the basis that all claims could then be brought in federal court.  Defendants deny that the University waived any such defense.

Plaintiff provides the decision from the Division of Human Rights dismissing his complaint in that body.  See Exh. A to Complaint, dkt. # 1-1.   That document provides that "the Division finds that noticing the complaint for hearing would be undesirable and the complaint, therefore, is ordered dismissed on the grounds of administrative convenience for the following reason(s): The Complainant intends to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination can be resolved."  Id. The decision also provides that any party to the proceeding could take an appeal within sixty days.  Id.

"'As a general rule, state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress.'" Jackson v. Battaglia, 63 F.Supp.3d 214, 220 (N.D.N.Y. 2014) (quoting Allessi v. N.Y.S. Dep't of Corr. & Cmty. Supervision, 16 F.Supp.3d 221, 225 (W.D.N.Y. 2014)).  The State University of New York, a division of New York, enjoys such immunity.  Id. (citing Richman v. Pediatric Serv. Grp., 222 F.Supp.2d 207,

209 (N.D.N.Y. 2002)).  Without a waiver or abrogation of immunity, then, the University is immune from the claims here, and "New York has not waived its sovereign immunity from . . . NYSHRL claims in federal court."  Id.  "A State may . . . consent to suit, although such consent must be 'unequivocally expressed.'"  PennEast Pipeline Co., LLC v. New Jersey, 141 S.Ct. 2244, 2258 (2021) (quoting Sossamon v. Texas, 563 U.S. 277, 284 (2011)).  The ''test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.'"  College Av. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999) (quoting Atascadero State Hospital v. Sanlon, 473 U.S. 234, 241 (1985)).

This is not a classic case where a state waives jurisdiction "by voluntarily invoking federal jurisdiction, as when the state itself brings federal suit or removes a case from state or federal court."  Deposit Ins. Agency v. Superintendent of Banks (In re Deposit Ins. Agency), 482 F.3d 612, 617 (2d Cir. 2007).  Such "waiver by litigation" does not rest "'upon a State's actual preference or desire,' but rather upon 'the judicial need to avoid inconsistency, anomaly, and unfairness.'"  Oseen v. Dep't of Soc. Servs. (In re Charter Oak Assocs.), 361 F.3d 760, 767 (2d Cir. 2004) (quoting Lapides v. Bd. of Regents, 535 U.S. 613, 620 (2002)).  Still, "[t]o constitute waiver, litigation conduct must indicate a 'clear indication of the State's intent to waive its immunity.'"  Guzzo v. Conn. State Colls. & Univs., No 21-cv-254, 2022 U.S. Dist. LEXIS 55072 at *15 (Dist. Conn. Mar. 22, 2022) (quoting In re Charter Oak Associates, 361 F.3d at 620, 622).

Here, the University did not file suit or remove the case to this court and objected on sovereign immunity grounds at the first opportunity.  The Plaintiff does not seek waiver on that basis.  Instead, Plaintiff  contends that the University has engaged in litigation in a way

15

that constitutes wavier by refusing to object to the dismissal in the Human Rights Division when the dismissal was for administrative convenience and contemplated refiling the discrimination claims in federal court. The Court cannot find that the University's litigation conduct in this instance amounted to a waiver.  The decision from the Division of Human Rights makes no reference to a right to bring NYSHRL claims against the University in federal court, and nothing in the warning about objections to the order references a waiver of a right to object on sovereign immunity grounds.  At best, the decision is ambiguous about any waiver of claims.  No clear waiver exists.  That the University engaged in litigation in another forum is immaterial, since " a State does not consent to suit in federal court merely by consenting to suit in courts of its own creation." College Sav. Bank, 527 U.S. at 676.

As such, the Court will grant the motion on this basis and find that the University is entitled to sovereign immunity for the NYSHRL claims.

**IV.     CONCLUSION**

For the reasons discussed above, Defendants' motion to dismiss, dkt. # 10, is hereby **GRANTED** in part and **DENIED** in part.  The motion is granted with respect to Plaintiff's NYSHRL claims against the University and with respect to any Title VII claims against the individual Defendants.  The motion is denied in all other respects.

Thomas J. McAvoy

Senior, U.S. District Judge

16

**IT IS SO ORDERED.**

Dated: October 30, 2023